# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **JULIA L.,**[1] | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )   CIVIL ACTION NO. 7:19–CV–230 |
| | ) |
| **COMMISSIONER OF SOCIAL SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## REPORT AND RECOMMENDATION

Julia L. ("Julia") filed this action challenging the final decision of the Commissioner of Social Security finding her not disabled and therefore ineligible for disability insurance benefits (DIB) under title II of the Social Security Act ("Act"). 42 U.S.C. §§ 401–433; R. 12–28. Specifically, Julia argues that the ALJ failed to properly evaluate the opinion evidence and her subjective allegations. I conclude that substantial evidence supports the ALJ's conclusion. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 16), **DENYING** Julia's Motion for Summary Judgment (Dkt. 12), and **DISMISSING** this case from the docket.

## STANDARD OF REVIEW

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Julia was not disabled under the Act.[2] Mastro v.

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent

Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This standard of review requires the Court to "look[ ] to an existing administrative record and ask[ ] whether it contains 'sufficien[t] evidence' to support the [ALJ's] factual determinations." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). "The threshold for such evidentiary sufficiency is not high." Biestek, 139 S. Ct. at 1154. The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

On July 20, 2015, Julia filed an application for DIB. R. 89, 190–191. Julia alleged disability from degenerative disc disease with nerve root issues, depression/anxiety, and loss of speech (periodic due to severed vocal cord nerve). R. 210. The state agency denied the claim initially and on reconsideration. R. 107–117, 119–125. The ALJ convened a hearing on October 5, 2017, at which Julia and a vocational expert testified. R. 35–77.

On February 16, 2018, the ALJ issued a decision analyzing Julia's claims under the familiar five–step process[3] and denying Julia's claim for benefits. R. 12–28. The ALJ found that

---

her from engaging in all forms of substantial gainful employment given her age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the

2

Julia met the insured status requirements of the Social Security Act through December 31, 2019 and had not engaged in substantial gainful activity since July 11, 2015. R. 14. The ALJ determined that Julia suffered from the severe impairments of degenerative disc disease with radiculopathy and chronic pain and meniscus tear. R. 15–16. The ALJ found Julia's medically determinable mental impairments of depression and anxiety to be nonsevere. Id. Next, the ALJ held that Julia did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, specifically considering listings 1.02 (Major dysfunction of a joint(s) (due to any cause)), 1.04 (Disorders of the spine), 1.04A (Disorders of the spine – nerve root compression), and 1.04C (Disorders of the spine – lumbar spinal stenosis). R. 16–17. Regarding Julia's mental impairments, the ALJ found that Julia's depression and anxiety, considered singly and in combination, did not cause more than minimal limitation and were nonsevere. R. 15. The ALJ determined that Julia had no limitations with understanding, remembering, or applying information and interacting with others and mild limitations with concentrating, persisting, or maintaining pace and adapting or managing oneself. R. 15–16.

The ALJ concluded that Julia had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except that she can occasionally handle, finger, and feel with the left (non–dominant) upper extremity; frequently climb ramps and stairs; occasionally climb ladders or scaffolds; occasionally kneel, crouch, crawl; occasionally be exposed to hazards such as unprotected heights and moving mechanical parts; tolerate occasional exposure to dust, fumes, odors, and pulmonary irritants; and tolerate occasional exposure to vibrations. R. 17. The ALJ held

---

claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

3

that Julia could perform jobs that exist in significant numbers in the national economy including usher, furniture rental clerk, and gate guard. R. 27–28.

The ALJ ultimately concluded that Julia was not disabled. R. 28. On January 31, 2019, the Appeals Council denied Julia's request for review. R. 1–6.

## **ANALYSIS**

Julia alleges that the ALJ failed to properly evaluate the opinion evidence and her subjective allegations.

### A. Medical History

Julia has suffered from neck pain since at least 2008. On November 4, 2008, Edgar N. Weaver, Jr., M.D., performed an anterior cervical discectomy and fusion at C6–7 to repair a herniated cervical disk at C6. R.334–335. Six years later in September 2014, Julia had marked and stabbing pain in her right neck. R. 404–405. Randall R. Rhea, M.D. of Vinton Parkway Family Practice noted a primary diagnosis of cervical radiculopathy. Id. Julia returned to Vinton Parkway Family Practice on January 26, 2015, because of constant and worsening neck pain. R. 403–404. There, E. Mark Watts, M.D., diagnosed Julia with degenerative disc disease and radiculopathy. Id.

On March 11, 2015, Thomas R. Milam, M.D. of Carilion Clinic Jefferson Psychiatry and Behavioral Medicine saw Julia for depression. R. 589–591. Dr. Milam found that Julia had physical problems which included gout, obesity, Mallory–Weiss syndrome, carcinoma colon, sciatica, cervicalgia, degenerative disc disease of the cervical spine with radiculopathy, and degenerative disc disease of the cervical spine with myelopathy. Id. Regarding Julia's mental health, Dr. Milam diagnosed Julia with major depressive disorder, dysthymic disorder, adjustment disorder with mixed anxiety and depressed mood, chronic fatigue, and anxiety state.

Id. At a September 3, 2015 evaluation, Dr. Milam noted that Julia's pain and degenerative disc problems in her neck, shoulders, and hips had kept her from working and exacerbated her underlying anxiety and depression. R. 593.

Dr. Watts saw Julia on May 11, 2015, neck and shoulder pain with associated numbness and tingling in the digits of bilateral hands. R 400–401. Dr. Watts diagnosed Julia with degenerative disc disease, cervical spine with radiculopathy and recommended steroid injections, and that she consider physical therapy. Id. Julia returned on June 11, 2015 due to complaints of congestion, sneezing, sore throat, and dry cough. R. 399–400. In August 2015, Julia returned to see Dr. Watts with complaints of acute chronic neck pain that radiated to the 2nd and 3rd digits of bilateral hands with associated numbness. R. 399. Dr. Watts diagnosed her with degenerative disease, cervical spine, with radiculopathy, ordered a cervical MRI and referred her to orthopedic surgery. Id. Unfortunately, Julia's insurance denied coverage for the MRI as not medically necessary. R. 398. She began physical therapy in October 2015 for neck and upper extremity pain. R. 521–524.

On September 3, 2015, Dr. Milam increased her medication and found that Julia continued to suffer from major depressive disorder, recurrent episode, moderate; dysthymic disorder; adjustment disorder with mixed anxiety and depressed mood; chronic fatigue; and anxiety state, unspecified. R. 593–594.

On November 18, 2015, Jonathan J. Carmouche, M.D. of Carilion Clinic Orthopaedics. diagnosed Julia with cervical degenerative disc disease, cervical radiculopathy due to HNP, prior ACDF C6-7, and cervical degeneration C5–6. R. 512–515. A cervical MRI on December 8, 2015 revealed multilevel cervical spondyloarthropathy. R. 463. A January 7, 2016 cervical CT scan showed the fusion at C6–C7 with no robust osseous fusion; multilevel cervical spondylosis; no

significant recurrent disc herniation; and multiple prominent appearing bilateral cervical chain lymph nodes. R. 464. On January 21, 2106, Dr. Carmouche wrote Julia that the MRI and CT scan showed that the previous fusion failed to completely heal and recommended observation, physical therapy, anti–inflammatories, injections, and, if necessary, a repeat of the surgery at C6–7 and fusion at C5–6. R. 649.

Julia complained of bilateral upper extremity pain at another appointment at Vinton Parkway Family Practice on November 14, 2016. R. 732.

Julia reported improvement in her mood despite periods of anger, usually when at work during an appointment with Carilion Jefferson Psychiatry and Behavioral Medicine on April 24, 2017. R. 699.

On May 8, 2017, Dr. Watts diagnosed Julia with degenerative disc disease, cervical spine, with radiculopathy, and noted that she was waiting for insurance coverage for a surgical repair of her cervical spine. R. 748.

On July 17, 2017, Julia sought treatment for knee pain from Carilion Clinic's Institute for Orthopaedics and Neurosciences. R. 779–786. There, John Mann, M.D., noted MRI results showing a tear of the lateral meniscus and recommended a diagnostic arthroscopy. Id. On August 16, 2017, Julia underwent a knee arthroscopy left with limited lateral meniscectomy at the Roanoke Ambulatory Surgery Center. R. 788–789.

**B. Medical Opinion Evidence**

On December 15, 2015, Richard Surrusco, M.D., reviewed the medical evidence and determined that Julia could perform light work but could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could sit, stand, and/or walk for 6 hours in an 8–hour workday; could frequently crawl and climb ladders, ropes, or scaffolds; could speak only frequently due to vocal

cord damage; and should avoid concentrated exposure to vibration and pulmonary irritants and hazards. R. 84–86. On February 25, 2016, Jack Hutcheson, M.D., reached the same conclusions. R. 95–98. The ALJ gave some weight to the state agency opinions, finding them not quite restrictive enough in the postural actions. R. 25.

On September 7, 2016, Dr. Watts completed a Physical Residual Functional Capacity Questionnaire which included diagnoses of cervical radiculopathy, failed fusion at C6–7, and major depression, and symptoms of neck pain, numbness, radicular pain, and vocal cord paralysis. R. 602–606, 717–725. Dr. Watts found that Julia was not a malingerer but that she would have constant interferences with attention and concentration; was capable of low stress jobs; could sit and stand/walk less than 2 hours in an 8–hour; would need periods to walk around; would need to be able to shift positions at will between sitting, standing, and walking; would need to take hourly unscheduled breaks; and would only rarely be able to lift less than 10 pounds. Id. Dr. Watts additionally found that Julia could only use her hands for grasping and turning/twisting objects or her arms for reaching for 50% of an 8–hour workday with her right hand and 0% with her left hand. Id. Dr. Watts also found that Julia would be absent from work 8 days a month. Id. The ALJ gave limited weight and partial weight to different elements of Dr. Watts' opinion. R. 25–26.

On March 13, 2017, J. Ruiz, M.D., a medical consultant with the Social Security Administration, completed a medical evaluation of Julia. R. 623–631. Dr. Ruiz found Julia able to occasionally lift 20 pounds; frequently lift 20 pounds; stand and/or walk 6 hours in an 8–hour workday; sit 6 hours in an 8–hour workday; engage in unlimited pushing and pulling; frequently climb ramps and stairs, balance, stoop, and kneel; occasionally crouch and crawl; never climb ladders, ropes, and scaffolds; engage in limited reaching, handling, and feeling; and engage in

7

unlimited fingering. Id. Dr. Ruiz found Julia to have no visual or communicative limitations. Id. Dr. Ruiz also determined that Julia needed to avoid concentrated exposure to extreme cold and vibration, and needed to avoid even moderate exposure to hazards. Id. The ALJ gave significant weight to Dr. Ruiz's opinion overall, but assigned only partial weight as to Dr. Ruiz's assessments of Julia's ability to perform fingering with her left hand, Julia's overall upper extremities, and Julia's limitations regarding hazards. R. 25–26.

### C. The ALJ's Evaluation of the Opinion Evidence

Julia argues that the ALJ failed to properly evaluate the opinions of Dr. Watts and the state medical consultants. Julia cites evidence she alleges the ALJ ignored in determining that the evidence did not support Dr. Watts' findings regarding the impact of Julia's neck pain, upper extremity radiculopathy, and lower extremity conditions. Pl.'s Brief, p. 10. Julia also asserts that the ALJ failed to consider speech limitations found by the state agency consultants. Id. at pp. 10–11.

When making an RFC assessment, the ALJ must assess every medical opinion received into evidence. See 20 CFR § 404.1527(c). When the ALJ evaluates the opinions of non-treating physicians, the ALJ must weigh three factors: "supportability in the form of a high-quality explanation for the opinion and a significant amount of substantiating evidence, particularly medical signs and laboratory findings; consistency between the opinion and the record as a whole; and specialization in the subject matter of the opinion." Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 268 (4th Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(3)–(5)). More weight is "generally" given to a source who has examined the claimant than to one who has not. See § 404.1527(c)(1).

The social security regulations in place at the time Julia filed her claim require that an ALJ give the opinion of a treating source controlling weight if he finds the opinion "well-

8

supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 10 20 C.F.R. § 404.1527(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001); Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 269 (4th Cir. 2017) (noting that "the ALJ is supposed to consider whether a medical opinion is consistent, or inconsistent, with other evidence in the record in deciding what weight to accord the opinion"). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Saul v. Astrue, No. 2:09–cv–1008, 2011 WL 1229781, at *2 (S.D.W. Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §§ 404.1527(c)(2) – (5), 416.927(c)(2) – (5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, No. 2:09cv622, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010). However, the ALJ "need not mechanically discuss every factor when choosing to afford a treating physician's opinion less weight, as long as the ALJ articulates the reasoning behind the decision." Haass v. Comm'r, Soc. Sec. Admin., No. CV BPG-17-1639, 2018 WL 2118705, at *1 (D. Md. Apr. 4, 2018).

The ALJ gave limited weight to Dr. Watts' opinion as to Julia's exertional abilities, holding that the evidence did not indicate that Julia's neck pain and upper extremity radiculopathy would limit her to the extent Dr. Watts found. R. 25–26. The ALJ described the right and left upper extremity limitations found by Dr. Watts as more restrictive than alleged by Julia to her health care providers or in her testimony. Id. The ALJ also found Dr. Watt's findings that Julia could rarely turn her head but also only occasionally hold it static contradictory, as well as inconsistent with Julia's testimony that she had only some difficulty turning her neck while driving. Id. The ALJ then gave overall partial weight to Dr. Watts' opinions. R. 25–26. Additionally, the ALJ gave limited weight to Dr. Watts' finding that Julia would miss work four times a month, finding that the evidence did not indicate that her pain was that intense. Id.

The ALJ gave the opinions of the state consultative examiners some weight, finding them not quite restrictive enough in the postural actions given Julia's left upper extremity weakness. R. 25–26.[4] The ALJ also gave the state consultative examiners' opinion regarding Julia needing to avoid concentrated exposure to pulmonary irritants partial weight, finding that some evidence indicates Julia had exacerbated voice issues when she has coughing and had drainage that might be affected by environmental conditions. R. 24.

The ALJ gave significant weight to the opinion of Dr. Ruiz based on Dr. Ruiz's finding that Julia could perform at the light exertional level with some postural actions limited to occasional. Id. However, the ALJ also determined the evidence to support restrictions beyond Dr. Ruiz's finding that Julia was capable of unlimited fingering except that she only engage in frequent gross manipulation with the left hand, concluding that Julia would be limited to frequently performing any fingering with the left hand. Id. The ALJ also found Dr. Ruiz's

---

[4] Julia appears to misread the ALJ as assigning significant weight to the opinion of the state medical consultants when the ALJ actually assigned significant weight to the opinion of Dr. Ruiz. See Pl.'s Brief, p. 11.

10

general limitation regarding Julia's upper extremities "vague" and concluded that, based on Julia's ability to garden, cook, and perform household activities with only some limitation, Julia did not suffer from any limitations regarding her upper right extremity. Id. The ALJ also found unsupported Dr. Ruiz's finding that Julia needed to avoid concentrated exposure to extreme cold and needed to avoid even moderate exposure to hazards, holding that Julia could be more vigilant during occasional exposures, had no particular sensitivity to cold, and does not suffer limitations in her lower extremities warranting her avoiding all exposure to hazards. Id. On those issues, the ALJ assigned the opinion of Dr. Ruiz only partial weight. Id.

Here, substantial evidence supports the ALJ's assessment of the medical opinion evidence. The ALJ gave partial weight to Dr. Watts' findings because the evidence did not indicate that Julia's neck pain and upper extremity radiculopathy would limit her abilities to lift, sit, stand, and walk as much as Dr. Watts found. R. 25. The ALJ concluded that Julia's issues in her lower extremities would not seem to limit her to never climbing ladders, ropes, and scaffolds as Dr. Watts determined. Id. Additionally, the ALJ noted that Julia could use her right hand despite complaints of numbness. Id. The ALJ also found contradictory Dr. Watts' conclusions that Julia could only rarely turn her head but also only occasionally hold it static, and further noted that no evidence supported her being limited to only frequently turning her head in a work situation. R. 25–26.

Julia points to evidence of chronic pain, right foot pain/plantar fasciitis, and weakness and atrophy in the left lower extremity as contradicting the ALJ's determinations as to Dr. Watts' opinion. Pl.'s Brief at p. 10. However, the ALJ addressed this evidence and explained why he nonetheless arrived at his conclusions. For example, the ALJ discussed Julia's chronic pain, citing Julia's reports that she generally experienced low pain amounts and that it only slightly

11

interfered with her sleep. R. 25. The ALJ described how right foot pain led to an injection to treat plantar fasciitis on August 22, 2016 but found that the record lacked any evidence that this was a longstanding issue. R. 15. Further, the ALJ's acknowledgment of "some weakness and atrophy in the left lower extremity" does not contradict his assignment of limited weight to Dr. Watt's opinion and aligns with the ALJ's RFC limiting Julia to only occasionally kneeling, crouching, and crawling. R. 26. It is not the purview of the court to re–weigh conflicting evidence where, as here, the ALJ cited substantial evidence in support of his conclusion.

      The ALJ fully explained the weight given to Dr. Watts's opinion considering both the length of treatment and the nature and extent of the treating relationship between Dr. Watts and Julia. R. 18–24. The ALJ clearly distinguished between where he gave some weight to the limitations established by Dr. Watts, such as with the lifting restrictions in her left upper extremity, and where he discounted Dr. Watts's opinions. Id. By explaining inconsistencies between the opinion of Dr. Watts and the record while acknowledging the extent of the treating relationship (R. 21–23), the ALJ gave "good reasons" for not affording controlling weight to Dr. Watts' opinion. See 20 CFR § 404.1527(c)(2). Further, the ALJ appropriately considered the opinions of the state agency consultants and Dr. Ruiz, again delving into their reasoning and explaining where he found them supported or not by the record. Id.

      Julia further argues that the ALJ failed to explain why he did not adopt the findings of the state agency consultants that Julia could only frequently speak. However, the ALJ attached greater weight to the opinion of Dr. Ruiz, who found no speech restrictions. See R. 628. Further, even if the ALJ had adopted this restriction in full and held that Julia could only frequently speak, the outcome would be the same, as all three jobs the ALJ determined that Julia could perform require only frequent speech. See DICOT 344.677–014, 1991 WL 672865 (Usher)

12

("Talking: Frequently"); DICOT 295.357–018, 1991 WL 672589 (Furniture Rental Clerk) ("Talking: Frequently"); DICOT 372.667–030, 1991 WL 673099 (Gate Guard) ("Talking: Frequently"). The ALJ described the amount of weight he assigned to each medical opinion, including where he assigned different amounts of weight to different components of an opinion, and clearly explained his reasons for doing so. Therefore, substantial evidence supports the ALJ's assessment of the medical opinion evidence.

### D. The ALJ's Evaluation of Julia's Subjective Allegations

Julia alleges that the ALJ failed to properly evaluate her allegations of disability. Pl.'s Brief at pp. 12–14. Julia argues that she had good cause to not want to have a surgery that Dr. Carmouche recommended because she indicated at the hearing that she felt she would have been better off not undergoing an earlier surgery. Id. See Soc. Sec. Ruling, Ssr 18-3p; Titles II & Xvi: Failure to Follow Prescribed Treatment, SSR 18-3P (S.S.A. Oct. 2, 2018) (good cause for not following recommended treatment includes, "[t]he individual previously had major surgery for the same impairment with unsuccessful results and the same or similar additional major surgery is now prescribed.").

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16–3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c).13 First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain. Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c),

416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

A reviewing court gives great weight to the ALJ's assessment of a claimant's statements and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). Further, a reviewing court will defer to the ALJ's assessment of a claimant's statements, except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all. See Bishop v. Comm'r of Soc. Sec., 583 F. App'x 65, 68 (citing Edeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997)).

Here, the ALJ found that Julia's statements concerning the intensity, persistence and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence in the record. R. 24. The ALJ noted that Julia generally did not report intense voice problems even though providers found her to have vocal cord paralysis. Id. The ALJ described Julia as complaining of numbness in her hand, but that she could still use her hand to type, albeit with less accuracy, and could engage in gardening and housework. R. 24–25. The ALJ described Julia complaining of neck pain and limited range of heck motion but, nonetheless, reporting low amounts of pain, taking limited medication, and only experiencing slight disruption to her sleep. R. 25. Finally, the ALJ also noted that Julia did not want to have neck surgery "due to her fears of surgery." Id.

Substantial evidence supports the ALJ's assessment of Julia's subjective allegations. Julia only contests the ALJ's analysis insofar as the ALJ relied on Julia's decision not to undergo another surgery. See Pl.'s Brief, pp. 12–14. However, even if I were to discount this element of the ALJ's evaluation for running afoul of SSR 16–3P, the ALJ would still have cited substantial evidence. The ALJ clearly explained which elements of Julia's complaints regarding the intensity, persistence, and limiting effects of her symptoms he found to lack support in the record. The ALJ reasonably concluded that the evidence did not support the degree of limitation Julia asserted experiencing regarding her speaking, hand movement, neck pain, and limited range of neck motion.

At bottom, I find the record provides substantial support for the ALJ's decision; thus, the existence of evidence in the record that could support a different decision does not merit reversing the ALJ. Julia essentially asks me to remand because the ALJ may have drawn improper conclusions from one piece of evidence when the ALJ also referenced multiple other pieces of valid evidence that constitute substantial evidence. It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work, and the uncontested evidence cited by the ALJ provides the necessary support for his conclusion. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re–weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Julia's subjective complaints with substantial evidence.

## CONCLUSION

For the foregoing reasons, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment, **DENYING** Julia's Motion for Summary Judgment, and **DISMISSING** this case from the docket.

The Clerk is directed to transmit the record in this case to Elizabeth K. Dillon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation which must be filed within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including a waiver of the right to appeal.

Enter: August 16, 2020

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge